UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

IN RE HURRICANE SANDY CASES

-------------------------------------------------------------X

DEBORAH RAIMEY and LARRY RAISFELD,

Plaintiffs,

-against-

WRIGHT NATIONAL FLOOD INSURANCE
CO.

Defendant.
-------------------------------------------------------------X

**MEMORANDUM &
ORDER**

14 MC 41

14 CV 461 (JFB)(SIL)(GRB)

APPEARANCES:

For the Plaintiff:

Mostyn Law
3810 West Alabama Street
Houston, Texas 77027
By:   Steve Mostyn, Esq.
        Rene M. Sigman, Esq.

Denis G. Kelly & Associates, P.C.
74 West Park Avenue
Long Beach, New York 11561
By:   Denis G. Kelly, Esq.

Gauthier, Houghtaling & Williams, LLP
3500 N Hullen St
Metairie, LA 70002
By:   Frederick W. Bradley, Esq.
        James M. Williams, Esq.

For the Defendant:

Nielsen, Carter & Treas, LLC
3838 N. Causeway Blvd., Suite 2850
Metairie, LA 70002
By:   Gerald J. Nielsen, Esq.
        Kristina J. Fonte, Esq.

McMahon Martine & Gallagher LLP
90 Broad Street
New York, New York 10004
By:   Anthony Martine, Esq.
        Patrick W. Brophy, Esq.
        Timothy D. Gallagher, Esq.

For Non-Party U.S. Forensic:

The Demmons Law Firm
3300 West Esplanade Avenue
Suite 601
Metairie, Louisiana 70002
By: Larry Demmons, Esq.

EXHIBIT
5

**GARY R. BROWN, United States Magistrate Judge:**

  Two years ago, the crushing force of Hurricane Sandy devastated large areas of this judicial district.  While much has been done to facilitate recovery, assistance has not been consistent or timely, leaving some homeowners behind – even those who properly paid for flood insurance. That some homeowners have faced insufferable delays has not been lost on the public[1] or our political system.[2]  This Court has invested significant resources in an effort to facilitate efficient resolution of the more than 1,000 cases arising from Hurricane Sandy.[3]

  Against this backdrop arises the instant dispute, which has exposed reprehensible gamesmanship by a professional engineering company that unjustly frustrated efforts by two homeowners to get fair consideration of their claims.   Worse yet, evidence suggests that these unprincipled practices may be widespread.

  Specifically, the evidence adduced in this matter demonstrates that U.S. Forensic, an engineering firm retained by defendant Wright National Flood Insurance Company ("Wright") to examine a storm-battered house in Long Beach, New York, unfairly thwarted reasoned consideration of plaintiffs' claim through the issuance of a baseless report.   The engineer sent by U.S. Forensic opined in a written report that the home at issue had been damaged beyond repair by Hurricane Sandy.   A second engineer, who did little more than review the photographs taken by the inspecting engineer, secretly rewrote the report, reversing its conclusion to indicate that the house had not been damaged by the storm, and attributing – without sufficient evidence – defects

---

[1] "It's been nearly two years since the region got walloped by superstorm Sandy.   Yet, incredibly, even now, Sandy still packs a nasty punch every day for many of those who have homes near the shore.   Because of a series of grinding, glacial bureaucracies, they still cannot afford the simple act of just going home." Matt Davies, *Sandy Lingers Two Years Later*, NEWSDAY, Oct. 17, 2014, http://www.newsday.com/opinion/cartoon-sandy-lingers-two-years-later-1.9519217.

[2] "[W]e should not be just litigating as a delaying tactic to not pay claims."   Testimony of FEMA Administrator Craig Fugate at Senate Banking Committee hearing on Flood Insurance Claims Process, Jul. 30, 2014, No. 14-MC-00041, Docket Entry ("DE") [497]-3.

[3] *See* Case Management Order ("CMO") 1 at 1-2 (discussing efforts of Committee); Order dated October 15, 2014, 14-CV-41, DE [563] (describing EDNY Hurricane Sandy mediator training program).

2

in the home to long-term deterioration.   This process, euphemistically dubbed a "peer review" by U.S. Forensic, was concealed by design from the homeowners, remained uncovered during the Court-assisted discovery process and came to light through near happenstance.   In a misguided attempt to defend these flawed practices, defendant has elicited evidence that this "peer review" process may have affected hundreds of Hurricane Sandy flood insurance claims – and possibly more.

In this decision, the undersigned addresses the evidence presented, makes relevant findings and directs certain relief to ameliorate the highly-improper practices brought to light in this case.

**Procedural History**

Following the failure of mediation to resolve this matter, plaintiffs' counsel filed a "Motion to Set Discovery Schedule and Set for Trial," informing the Court, for the first time, that it had evidence of a U.S. Forensic engineering report that provided a conclusion contrary to the report upon which Wright based its denial of much of plaintiffs' flood insurance claim.   DE [57].   In response, Wright, among other things, denied all knowledge of the seemingly altered report, blamed plaintiffs for failing to provide evidence of the earlier report prior to mediation, sought to select a different expert as "this engineer and U.S. Forensics [sic] are now allegedly tainted," and demanded that plaintiffs provide all information concerning the discrepancies in the engineering reports to the new engineer.[4]   DE [59] at 13.   Upon review of the parties' submissions, on October 1, 2014, the undersigned issued the following Order:

> In light of the nature of the allegations set forth in plaintiffs' submission and defendant's response thereto, a hearing shall be conducted before the undersigned . . . . At that hearing, plaintiffs shall be prepared to present testimony and documentary

---

[4] In its response, counsel for Wright correctly characterize the allegations raised by plaintiffs as "indeed serious," properly noting that such charges "go to the very core of any court's ability to perform its function."   DE [59] at 1. But rather than approaching these charges with the measured or conciliatory response one might anticipate, counsel, *in the text of its memorandum filed with the Court,* actually threaten the plaintiffs with a substantive denial of their claim should they fail to cooperate with Wright's demand to provide information about this matter to its yet-to-be-designated engineer.   *Id.* at 13.

> evidence concerning the allegations relating to U.S. Forensic Report No. 12.22.1304 and the various incarnations of that report referenced in the parties' submissions. Counsel for the parties will ensure that Mr. George Hernemar will be present in person to testify about the preparation and submission of the report and related matters. Counsel for defendants will also produce any other necessary witnesses to explain, as appropriate, any differences between the purported original report and the report ultimately produced in discovery.

Electronic Order dated October 1, 2014. On October 16, 2014, an evidentiary hearing was held, at which the parties produced three witnesses. At the conclusion of the hearing, plaintiffs' counsel indicated that, in addition to the relief previously sought, the Court should consider addressing discovery violations that resulted from the failure to provide the draft engineering reports in this case. Tr. 168. Following the hearing, both sides were permitted to submit post-hearing briefs and supporting materials.

**The Evidence Adduced at the Hearing**

Plaintiffs were the owners of a property located at 24 Michigan Street, Long Beach, NY, which is located about one block from the beach. The owners, who own and reside in an adjacent home, bought the house at 24 Michigan Street with plans to ultimately expand their own home, but rented the house to help pay the mortgage. Tr. 22. After Hurricane Sandy struck, one of the homeowners observed significant damage to the house that did not exist prior to the storm, including extensive damage to the floors, which had shifted in the storm. Tr. 14-15. Following the storm, the back door would no longer open, such that the homeowner had to break it down to gain access to the house. Tr. 16.

On or about November 17, 2012, David Maxime, an independent adjustor, examined the home. Based largely on the report of the adjustor, defendant paid the plaintiffs slightly more than $60,000 (in several installments) for cosmetic, non-structural damage. Tr. 21. Maxime also

prepared a document entitled "Engineer Request for Fidelity,"[5] in which he makes the following observations:

> During a recent flood inspection, I noticed the flooring in the dwelling was uneven from the front to the rear. The floor seemed to have a "rolling action" as you walked over it. A visual inspection of the flooring at several of the walls, appeared to have dropped about a [sic] inch or two in some cases. There was a 5 inch difference between the ceiling height at the corner of the bedroom and the center line of the bedroom. The exterior of the building had about 3ft of sand adjacent to the building. An inspection of the building crawl space showed several framing members out of line. A visual inspection of the front of the roof showed unevenness along the roof line. **At the current time, the building appears to be unsafe to live in.**

Pl.'s Ex. 2 (emphasis added). Presumably in response to this request, U.S. Forensic sent George Hernemar, a licensed engineer to conduct an inspection of the premises on December 4, 2012. Pl's. Ex. 3 & 5.

Trained in Sweden, Hernemar obtained employment as a contractor with U.S. Forensic, a nationwide engineering firm, after answering an ad on Craigslist for a New York licensed engineer. Tr. 44-45, 88. He testified that he conducted approximately fifty home inspections for U.S. Forensic to assess damage inflicted by Hurricane Sandy. Tr. 44-45. U.S. Forensic had been engaged by Fidelity to report on the damage to the 24 Michigan Street property.

Following his inspection, Hernemar wrote and transmitted a report[6] dated December 9, 2012 ("December 9 report") containing his findings to U.S. Forensic. The report, which contains

---

[5] No explanation was provided as to Fidelity's role in this matter. However, according to public records, Wright, the defendant, acquired Fidelity's flood insurance business, and as a result "Fidelity National Indemnity Insurance Company . . . operate[s] as a wholly-owned subsidiary of WRM America." *WRM America to Acquire Fidelity National Financial's Flood Insurance Business*, WRIGHT SPECIALTY INSURANCE, Jul. 13, 2011, http://www.wrightspecialty.com/newsletters-press-releases/44-wrm-america-to-acquire-fidelity-national-financial-s-flood-insurance-business.html.

[6] Counsel for defendant argues that the December 9 report, which was not stamped and sealed by Hernemar, was not a "report." *See, e.g.*, Tr. 45, 85. However, this argument is undermined by, among other things, Mr. Hernemar's sworn testimony. Tr. 101("Every report I see as final. Everything I submit to US Forensic is a final report"). He did, at the same time, vacillate on this point. Tr. 72 ("the first report is not final in that sense. It is a draft you send. And if US Forensic has no issue with that report, then I get the confirmation that my report was good. And if I get the call from US Forensic, their engineer, and want to discuss the report with me, then I know if they have some other points they want me to consider maybe. We have a discussion. And that happened in this case").

numerous pages of text and photographs, offers the following "Results and Conclusions":

1) The physical evidence observed at the property indicated that **the subject building was structural [sic] damaged** by hydrodynamic forces associated with the flood event of October 29, 2012. The hydrodynamic forces appear to have caused the foundation walls around the south-west corner of the building to collapse.

2) The extent of the overall damages of the building, its needed scope of repair combined with the age of the building and its simple structure, leads us to conclude that a **repair of the building is not economically viable**.

Pl's Ex. 5 (emphasis added).   However, plaintiffs never received this report from their insurance carrier.   Rather, they received a report dated January 7, 2013 ("January 7 report") which contains completely divergent "Results and Conclusions":

1) The physical evidence observed at the property indicated that **the subject building was not structurally damaged** by hydrodynamic forces, hydrostatic forces, scour or erosion of the supporting soils, or buoyancy forces of the floodwaters associated with the subject flood event.

2) The physical evidence observed at the subject property indicated that **the uneven roof slopes, leaning exterior walls and the uneven floor surfaces within the interior of the building,** were the result of long term differential movement of the building and foundation that **was caused by long-term differential movement of the supporting soils at the site and long-term deflection of the building framing**.

Pl's Ex. 3 (emphasis added).   Based upon this report, defendant refused to pay for any structural damage to the home.

At the hearing, Hernemar and a second witness explained that the radical changes in his report resulted from a "peer review process," though the description of that process varied greatly.   Hernemar testified that he "wrote both of these reports" and insisted that no one made any alterations or changes to the reports.   Tr. 57; *cf*. Tr. 58 ("All those reports you have presented to me, I'm the author of them.")   Rather, he testified, he had "an open

discussion" on the telephone with U.S. Forensic engineer, who pointed out that "the draft was based on assumptions."   Tr. 59, 71.   As a result, Hernemar "issue[d] a report changing [his] opinions."   Tr. 78.   And though his testimony was, at times, confused, he testified unequivocally that "I rewrote my report."   Tr. 90; *cf.* Tr. 106 (Hernemar "made changes to the draft report"); 119 ("I did the changes").

>    After Hernemar testified, counsel for defendant attempted to end the hearing, foreclosing further inquiry on this subject:

> MR. MARTINE: Judge, I think the purpose of this hearing was to determine whether we should have some discovery; in essence, whether or not something untoward was going on between US Forensic and perhaps Mr. Hernemar.

> THE COURT: Are you under the impression that the result of the hearing so far gives us a clear answer to that?

> MR. MARTINE: Yes, Judge . . .

> THE COURT: You brought a witness who is going to talk about the peer review process. Right?

> MR. MARTINE: I don't think I need to call him, Judge.

Tr. 119-120.   Both counsel for plaintiff and the Court disagreed.   *Id.*   After a lunch recess, counsel for defendant tried again:

> MR. MARTINE: Judge, my feeling is that, based on the testimony this morning and based on the reason for this hearing, the hearing is resolved.   The witness clearly testified that those were his opinions adopted by him following a peer review process; that he wasn't required, he wasn't compelled, he wasn't really told to do anything.   He adopted the opinions.

Tr. 121.   Importantly, counsel for defendant acknowledged that he was aware of the information to which Michael Garove, the "peer review" engineer, would testify:

> And I can tell you what Mr. Garove will testify, and this is a representation to the court, is that, yes, he was the peer reviewer for the original report, the rough report

of December, that his peer review, basically his peer review, he made suggestions and that the two engineers consult about the suggestions and that Mr. Hernemar could adopt or deny every single suggestion made and then the report is finalized. And that is the extent of the testimony concerning the peer review, Judge.

Tr. 123-4.   Notwithstanding counsel's representation, counsel for plaintiff requested that Garove be permitted to testify, which application was granted.   Tr. 124-26.

Michael Garove testified that he is an engineer licensed in Louisiana and New York, having obtained the latter license in 2011, who has worked for U.S. Forensic for approximately four and a half years.   Tr. 128.   He did not, at any time, inspect the 24 Michigan Street home or any portion of the property, and was unsure whether he had inspected any of the surrounding homes.   Tr. 129.   He was, however, assigned to review the December 9 report authored by Mr. Hernemar.   Tr. 137.   He received an email assigning him review of that report, "most likely from Gary Bell," Managing Partner of U.S. Forensic.   Tr. 137-8.   Garove provided the following description of U.S. Forensic's "peer review" process:

The peer review process, when we receive the initial document it is a draft form . . . Meaning, it is not a final version.

And within Microsoft Word, which is a software program that we all should be familiar with, there is a tab in there, a process by which you can initiate a tracking of any type of markups, changes, comments, whatever you would like to do in that report . . .

So . . . the peer review process involves reviewing the contents of the report, both technically, grammatically, you know, the entire content of the report, as well as reviewing any other drawings, photographs, or any other information that the inspecting engineer would produce or provide to us.   From that information . . . we basically evaluate as a peer, as an engineer, the validity of what is being stated . . . and then make a final determination about whether or not the conclusions that are included within the report are accurate or in line with, you know, engineering knowledge.

8

[O]nce that's done, this copy of this report, which has everything that you do as a peer reviewer, is then tracked and documented, so it is not hidden, is submitted back to the office and/or the engineer, inspecting engineer, for their review to determine whether or not they feel as though any changes, comments, markups or anything are correct or in line with their opinion.

And then at that point there is an opportunity, even again within that same software program, to either individually accept or deny any changes that you make or alterations . . . .

Tr. 138-40.

Thus, rather than the "open discussion" described by Hernemar, Garove described a process by which the report authored by the inspecting engineer was *rewritten* by an engineer who had not inspected the property and whose identity remained concealed from the homeowner, the insurer and, ultimately, the Court. Garove acknowledged that he revised the December 9 report, sent what became the final report to Hernemar and, remarkably, stated that the two had no further discussion or contact in the matter. Tr. 145-47. Instead, it appears that Hernemar "adopt[ed Garove's] conclusions completely." Tr. 147, 152.

Garove endeavored to minimize the changes he made in this report, testifying that "in this case a lot of stuff just got moved around, it got restructured, because the grammar was not correct or it wasn't in the proper place in the document." Tr. 139-40. In truth, Garove reversed the conclusion of the inspecting engineer, and removed many pertinent observations which were inconsistent with Garove's conclusions. And, despite repeatedly asserting that he had never *read* the January 7 report, in response to a question by the Court, Garove conceded that he, in fact, *wrote* the January 7 report. Tr. 156.[7]

---

[7] During the hearing, counsel for defendant, repeatedly attempted to block inquiry by plaintiff into the bases for Garove's opinions. Tr. 144-45 ("I'm going to object only because it appears that the examination is now getting into

In his declaration, Garove has the temerity to assert the following:

> Visual observations from an inspecting engineer during a site visit are not necessarily as informative as a review of photographs of the property after the site visit because review of quality photographs by an experienced peer-reviewer can yield more accurate analysis and results than direct visual observation of conditions by an inspecting engineer with less experience and understanding of the subject.

DE [71]-1 at ¶ 26.   The thought is, then, that Garove, sitting in a remote location and never seeing the subject property, can do a better job than a licensed engineer sent to the scene. This assertion begs the question of why U.S. Forensic would not simply send a photographer to homes to be inspected, and produce purportedly superior reports at lower cost by having a remote engineer review the resulting photographs.   It also raises the issue of why Garove did not sign the subject report, since he is the one who actually performed the analysis.

Garove's assertions are undermined by the substance of the report, which provides the reader, in uncertain terms, with assurances that this report is based upon a physical inspection of the property by, and relying upon the expertise of, Hernemar, the inspecting engineer.   The January 7 report lists Hernemar as the "Engineer of Record," while making no mention of Garove, any other contributor, or any peer review process.   Pl.'s Ex. 3.   The report's conclusions are expressly premised upon "[t]he physical evidence observed at the property," and states that "our work to complete this assignment was performed by George Hernemar, P.E."   *Id.* at 1-2.   A substantial portion of the report is devoted to "Site

---

what this gentleman's opinion might be, which is subject to a different type of hearing"); Tr. 149 ("If counsel wants to obtain the opinion of this witness as to why he reached those conclusions, this is not what this hearing is all about"). Then, notably, defendant's counsel proceeded to elicit some of Garove's engineering opinions on cross-examination, and, in its post-hearing submission, defendant submitted an 11-page, single-spaced declaration from Garove, in which he further attempts to support his expert conclusions that were injected, without attribution, into Hernemar's report. *See* Tr. 158-161; DE [71]-1.

Observations," and makes repeated references to such observations. *See, e.g.*, *id.* at 3 ("No . . . evidence of recent shifting . . .was observed beneath the building"); 4 ("We observed no evidence or indication . . ."); 5 ("but no evidence or any recent shifting . . . was observed."). Taken together, these statements concerning the methodology employed and the information relied upon render the report misleading.

Moreover, the changes wrought by Garove on Hernemar's work journeyed beyond misleading into the realm of misrepresentation. In the December 9 report, Hernemar noted that a deposit of sand prevented him from examining the foundation to determine whether it had collapsed, and would have to be removed before a "definite determination" could be reached. Pl.'s Ex. 5 at 4; Tr. 61 ("the foundation was covered with sand, so there was no way to tell definitively what happened to [the] foundation"). As counsel for Wright elicited in cross-examination of Hernemar, limited access to the crawlspace similarly circumscribed the inspection. Tr. 107 (The foundation "was covered in sand. The whole foundation. Plus, there was no access to the crawlspace."). Hernemar's conclusion that the foundation of the house had collapsed was, in part, an extrapolation from his examination of a neighboring house – the foundation of which was visible – and which, he believed, had been subject to similar hydrostatic forces during the storm. Tr. 82-83.

Garove tacitly acknowledges this limitation in his Declaration: "As I initially *believed*, it was *later confirmed* that the foundation walls beneath the building had not collapsed." DE [71]-1 at ¶ 63. Yet, notwithstanding the fact that the foundation walls could not be seen or photographed, Garove modified the report not only to remove this limitation, but to repeatedly and conclusively state that "no evidence" was observed of

11

damage to the foundation components.[8]   In other words, the limitations of Hernemar's

observations and his subsequent extrapolation may have justified amending the report to

make it inconclusive.   Instead, under the guise of "peer review," Garove transformed the

report to indicate a conclusive *absence* of storm damage.   A similar issue arises with

respect to Garove's "observations" relating to the crawlspace.   Hernemar testified that he

had extremely limited access to the crawlspace and the three supplied photographs of the

crawlspace area depict a very narrow view.   Nevertheless, Garove introduced specific

observations about the crawlspace into the report that appear entirely unsupported by

Hernemar's report and the accompanying photographs.   *See* DE [77]-1 at 7.

In addition to changes, Garove included the following "comment" addressed to

Hernemar in the redline draft:

> George:
>
> Please note the changes/comments within the report. Please noted [sic] that we don't
> theorize about damages. We observe, inspect and report damages to the building.
> In this case, **we did not observed** [sic.] any damage from hydrostatic,
> hydrodynamic, buoyancy forces or scour or erosion of support soils that caused
> damage to the subject building or foundation.
>
> **Please finalize this report and send to Donna for issue.**
>
> Michael P. Garove, P.E.
> Partner[9]

DE [77]-1 at 1 (emphasis added).    Unsurprisingly, Hernemar accepted all of Garove's

changes and had the document issued as instructed.   Notwithstanding the vehement

---

[8] Garove's assertions that "no evidence" was observed also would be true – and equally unavailing – had the inspector
been blindfolded during the inspection.

[9] Curiously, at the hearing, Garove did not testify that he was a partner at the firm, merely that he was "employed" by
U.S. Forensic. Tr. 128.

assertions of Wright's counsel, Hernemar's acquiesce to this baseless reversal of the report's conclusion and alteration of the observations does little to validate this unprincipled process.[10]

Troublingly, the "peer review" process extended beyond this one example. In this very case, as noted elsewhere, Hernemar described a peer review of his supplemental report that resulted, again, in a change to his ultimate conclusion concerning foundation damage upon reinspection. Tr. 109; 111-112. Furthermore, Hernemar stated that – in his rough estimation – he completed fifty Hurricane Sandy inspections for U.S. Forensic, and that in four or five instances, extensive changes were wrought as a result of so-called peer review. Tr. 89. This process was limited neither to this one engineer, nor specifically to U.S. Forensic. *See* Tr. 58 (describing process as "normal"); 110 (process was "standard"); 129 ("peer review process is actually a very standardized process *across the field of engineering*"); DE [71]-1 at ¶¶ 13-16 (describing hundreds of peer reviews of reports by different engineers).

On December 31, 2012 – after Hernemar's initial inspection but prior to the release of the January 7 report – an inspector from the City of Long Beach examined the structure. As a result of that inspection, the City provided plaintiffs with a "substantial damage letter" dated January 3, 2013, which indicates that the house "received damages of [63.4%] of the value of the pre-damaged structure as a result of the flooding that occurred on October 29, 2012." Pl.'s Ex. 1; Tr. 6-7. Based on that finding, the City advised plaintiffs that the house "must either be removed . . . or have the lowest floor . . . elevated to at or above the 100-year flood elevation." Pl's Ex. 1. In

---

[10] Counsel has made a number of arguments about Hernemar's credibility. As even a reading of the cold record will reveal, Hernemar's testimony may be charitably characterized as confused.

13

supporting documents, the inspector calculated a replacement cost of $269,850 and an "actual cash value"[11] of $204,546.30 for the house.

Upon receipt of the January 7 report – which ran counter to all of the other information received by the plaintiffs – the homeowners began contacting Wright, seeking a second inspection by a different engineer. Tr. 16. After plaintiff made several dozen telephone calls to the Company, Wright relented, apparently asking U.S. Forensic to again inspect the property. Tr. 16. On January 25, 2013, U.S. Forensic sent Hernemar to conduct a reinspection. Tr. 17-18. It was during this visit that plaintiffs viewed and photographed the cover and conclusion pages of Hernemar's December 9 report, thereby bringing to light the issues discussed in this opinion. Tr. 17.[12] Removal of the sand and better access to the crawlspace permitted Hernemar to more thoroughly inspect the foundation. Tr. 109. As a result of that examination, Hernemar uncovered a small amount of foundation damage to the house,[13] for which Wright compensated the homeowners a total sum of approximately $11,000. *Id.;* Tr. 21. Thus, the total paid by Wright on the file amounted to less than $80,000.

Given this relatively small insurance recovery and the damage to the home which rendered it uninhabitable, plaintiffs could no longer rent the house. Without the rental income, plaintiffs could not afford to continue paying the mortgage and property taxes, so they sold the 24 Michigan Street house for the value of the property. The house has since been razed. Tr. 22.

---

[11] The letter advised that this figure could be used in lieu of a market value under applicable FEMA rules. *See* Pl.'s Ex. 1; FEMA Publication 213 (". . .the structure's Actual Cash Value" may be "used as a substitute for market value based on the preference of the community").

[12] Hernemar and plaintiff Kaible presented divergent accounts of how this came to pass. Kaible testified that Hernemar – after denying that he had authored the January 7 report – permitted Kaible to review the December 9 draft. Tr. 17. Hernemar denied this, suggesting that Kaible must have improperly gained access to the draft report. Tr. 114. Notwithstanding defendant's arguments to the contrary, I find the issue largely immaterial. However, based upon the testimony and my evaluation of the witnesses, I fully credit the plaintiff's account.

[13] In yet another twist, Hernemar reports that he did not at first believe that he had uncovered foundation damage, but a "peer review" of his supplemental report by U.S. Forensic convinced him otherwise. Tr. 109; 111-112. However, since Garove testified that he did not review the supplemental report, the details of this remain hazy. Tr. 111-112.

**Discussion**

*A. Defendant's Discovery Obligations*

In an effort to streamline resolution of these claims, and reduce the costs and burdens on the

parties, after thorough consultation with counsel for all parties, the Committee of magistrate judges

appointed to manage Hurricane Sandy cases effected an expedited discovery process.   In the

course of nearly a dozen Case Management Orders ("CMOs") and through hundreds of

conferences, the Committee has implemented this process, modifying and adding provisions based

upon experience gained over the past months.

In CMO#1, issued on February 21, 2014, the Committee directed defendants to produce:

> any documentation relating to an assessment of the claimed loss, including all loss
> reports and damage assessments, adjuster's reports, engineering reports, contractor's
> reports, photographs taken of the damage or claimed losses, and any other
> evaluations of the claim [and]

> all expert reports and/or written communications that contain any description or
> analysis of the scope of loss or any defenses under the policy.

CMO 1 at 9.   On April 7, 2014, in CMO 3, the Committee reiterated this direction:

> Liaison Counsel forwarded a question from defense counsel to the Committee as to
> whether expert reports are subject to production pursuant to the automatic discovery
> process. It is hereby ordered that, to the extent that any such report was prepared
> prior to the issuance of this Order, such report must be produced immediately to
> opposing counsel.   CMO#1 expressly provides that defendants are to provide "all
> expert reports and/or written communications that contain any description or
> analysis of the scope of loss or any defenses under the policy." CMO#1 at 21.   To
> be clear, any expert reports that have been prepared are required to be produced
> under this provision, regardless of whether a party anticipates, at this time,
> presenting the testimony of such expert.   At the same time, CMO#1 should not be
> read as imposing an affirmative duty to create such a report, but if it exists, it should
> be produced.

CMO 3 at 9-10.   The Committee addressed any potential claims of privilege, noting:

> Rule 26(b)(4)(D) provides that "[o]rdinarily, a party may not . . . discover facts
> known or opinions held by an expert who has been retained or specially employed
> by another party in anticipation of litigation or to prepare for trial and who is not

expected to be called as a witness at trial." However, this privilege "may only be invoked when an expert has been retained or specially employed because of the prospect of litigation, and not in the normal course of business." *QBE Ins. Corp. v. Interstate Fire & Safety Equip. Co., Inc*., 2011 WL 692982 (D. Conn. 2011)(rejecting application of rule to notes by claims adjustor of conversations with experts); *Fine v. Bellefonte Underwriters Ins. Co.,* 91 F.R.D. 420, 423 (S.D.N.Y. 1981)(reports producible unless "generation of the reports were in furtherance of a sufficiently identifiable resolve to litigate, rather than a more or less routine investigation of a possibly resistable claim on a first party insurer"); *Tayler v. Travelers Ins. Co.*, 183 F.R.D. 67, 70 (N.D.N.Y. 1998) ("where there is a disagreement between the property owner and the insurance carrier as to the amount of the fire loss, the property owner/insured/plaintiff is entitled to discovery of the carrier/defendant's file and depose adjusters") (collecting cases).

CMO 3 at n.5. Thus, since February 2014, defendant has been under unequivocal and repeated Court direction to produce all expert reports, photographs and "written communications that contain any description or analysis of the scope of loss or any defenses under the policy." Yet, Hernemar's December 9 report, the redline document that transformed that report into the January 7 report, as well as a bevy of email communications[14] surrounding the creation, transmission and modification of these documents – all of which clearly fall within the ambit of CMO 1 and 3 – have never been produced.

Counsel for Wright raise two defenses for the defendant's failure to comply with these Court orders. The first is a belated contention that the so-called "draft" reports are protectable work product under Federal Rule of Civil Procedure ("Rule") 26(b)(4)(B). *See* DE [71] at 13-14. Because counsel failed to raise this issue earlier, either through an application for a protective order or the provision of a privilege log, it is clearly an afterthought. Of course, the Committee essentially addressed this argument in CMO 3 by

---

[14] The record is replete with references to email communications between and among the participants that clearly relate to these matters, including Hernemar, Garove, Gary Bell and others.

holding the privilege relating to non-testifying experts inapplicable to reports and written communications relating to these cases. *See* CMO 3 at n.5; *cf. Weber v. Paduano*, No. 02 Civ. 3392 (GEL), 2003 WL 161340, at *7 (S.D.N.Y. Jan. 22, 2003) ("investigations into the causes and effects of an accident, undertaken soon after the event itself, are generally considered part of an insurance company's ordinary course of business").

The privilege argument flatly fails on the merits, as the protections relied upon by defendant under Rule 26(b) apply only to drafts "that are prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26 (b)(3)(A). The authorities cited by defendant uniformly echo this limitation. *See, e.g.*, *In re Application of Republic of Ecuador*, 280 F.R.D. 506, 511 (N.D. Cal. 2012*), aff'd sub nom.*, *Republic of Ecuador v. Mackay,* 742 F.3d 860 (9th Cir. 2014) ("expert reports were prepared for trial and in anticipation of litigation"). Counsel's efforts to label these documents as draft expert reports – particularly on the facts here – cannot protect them from disclosure. As one district judge has held:

> To be sure, courts must be careful in cases involving insurance and surety disputes not to hold that documents are protected from discovery simply because of a party's ritualistic incantation that all documents created by insurers are made in preparation for litigation. Because all insurance investigations are likely performed with an eye towards the prospect of future litigation, it is particularly important that the party opposing production demonstrate by specific and competent evidence that the documents were created in anticipation of litigation.

*Safeco Ins. Co. of Am. v. M.E.S., Inc.,* No. 09-CV-3312 ARR VMS, 2013 WL 1680684, at *5 (E.D.N.Y. Apr. 17, 2013). Based upon the evidentiary hearing, I find that not only did Wright fail to demonstrate any legitimate need to protect the documents at issue, but that plaintiffs have overwhelmingly demonstrated a need for disclosure. In light of the unorthodox methodology employed to generate reports that resulted in a denial of plaintiffs' insurance claim, permitting defendant to withhold these documents would constitute a

serious injustice.

Where a Court orders production of draft reports – and, to be clear, CMO 3 unequivocally so directs – the Rule provides that it must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Counsel for Wright describe the preparation of these drafts as follows:

> All revisions to draft reports were made a year before a lawsuit was filed, exclusively by and among the US Forensic field engineer George Hernemar, P.E. and the US Forensic peer review engineer Michael Garove, P.E. Only after the lawsuit was filed a year later was Nielsen, Carter & Treas, LLC retained.

DE [71] at 1. In light of this description of the preparation of these documents, it difficult to understand how counsel can assert work product in good faith. Because counsel did not even appear in the matter until a year after their creation, the documents at issue simply cannot contain any mental impression of counsel, and were clearly not prepared for the purposes of litigation. Thus, the Court need not conduct further review of draft reports or associated emails or other written communications before their production.

The second defense raised by counsel arises from the undisputed fact that U.S. Forensic only provided the two so-called final reports to Wright, which, in turn, disclosed those reports to plaintiffs.[15] However, counsel has a duty to conduct a "reasonable inquiry" to ensure that discovery responses are "complete and correct". *See* Fed. R. Civ. P.

---

[15] Another "defense" repeatedly asserted by counsel for Wright is that the insurer would have no incentive to lowball or improperly refuse to pay claims because Write Your Own policy ("WYO") carriers are compensated as a percentage of payout, and thus have an incentive to pay. Some – including one plaintiffs' attorney in this case – believe otherwise. *See* Merlin, Chip, *National Flood Claims Do Not Get Paid Properly Because the Only Incentive is to Underpay*, PROPERTY INSURANCE COVERAGE LAW BLOG, http://www.propertyinsurancecoveragelaw.com/2014/07/articles/consumer-protection/national-flood-claims-do-not-get-paid-properly-because-the-only-incentive-is-to-underpay/. In any event, at least on this this record, defendant's motives regarding the payment of claims are entirely irrelevant to the actions of the engineering company discussed herein.

26(g)(1).   Rule 34 provides that parties "produce . . . items in the responding party's possession, custody, or control."   Importantly, "'[c]ontrol' is broadly construed, and thus a party may be obligated to produce documents requested under Rule 34 where the producing party does not actually possess the documents but has the legal right or practical ability to obtain them from another source on demand." *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 90 Civ. 7811 (AGS), 1994 WL 510043 at *3 (S.D.N.Y. Sept. 16, 1994); *see also Bank of New York v. Meridien BIAO Bank Tanzania Ltd.,* 171 F.R.D. 135, 146 (S.D.N.Y. 1997)(same).

As a result, "[p]roduction may be ordered when a party has the legal right to obtain papers, even though he has no copy." *Zervos v. S. S. Sam Houston,* 79 F.R.D. 593, 595-96 (S.D.N.Y. 1978).   Many cases have held that to properly comply with document demands, a party may be required to produce documents held by a third party where the relationship amounts to control.   *See, e.g.*, *Cooper Indus., Inc. v. British Aerospace, Inc*., 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984) (defendant, a wholly owned subsidiary of its parent British affiliate, controls documents owned by the parent company where "it is inconceivable that defendant would not have access to these documents and the ability to obtain them for its usual business"); *Herbst v. Able*, 63 F.R.D. 135, 138 (S.D.N.Y. 1972) (corporation's former and current employees were "persons within its control"); *M.L.C., Inc. v. N. Am. Philips Corp.,* 109 F.R.D. 134, 138 (S.D.N.Y. 1986) ("control" over agreements held by corporate subsidiary).

There has been no claim here, nor does one seem likely, that defendant lacked the legal right and/or practical ability to obtain these documents from U.S. Forensic.   Indeed, the evidence produced at the hearing suggests precisely the opposite – the nature of the business relationship between Wright and U.S. Forensic included the repeated provision of

documents and personnel by the engineering firm at the request of the insurer.   Common sense dictates a similar conclusion.

In fact, the argument by defendant's counsel seems to be limited to the fact that "[i]n the Defendant's claims file, which was fully and timely produced, was an original report, and then a supplemental report." DE [59] at 2.   Thus, counsel's contention is that by producing its own file, Wright satisfied its discovery obligations and counsel discharged its duty to perform a "reasonable inquiry" merely by asking Wright for that file.   Under the circumstances, this level of investigation did not satisfy counsel's obligations.   As this Court repeatedly directed the parties to produce all reports and written communications, an investigation that failed to include an inquiry with the engineering firm is clearly insufficient under the circumstances.   This is particularly true where, as here, as defendant's counsel well knew, plaintiffs were not permitted to seek discovery directly from U.S. Forensic, as such disclosure was not authorized under the CMOs, and there was a reasonable chance that U.S. Forensic would prove to be defendant's expert at trial.

In fact, one particular aspect of discovery in this matter undermines defense counsel's claim that provision of the two reports in Wright's claims file effectively discharged its obligations under this Court's discovery orders.   Among the items ordered produced in CMO 1 were "all . . . photographs taken of the damage or claimed losses." CMO 1 at 9.   Hernemar testified that while he attached approximately twenty photographs of the property which were included as part of his December 9 (and ultimately January 7) reports, he took more than fifty photographs which were supplied to U.S. Forensic.    The January 7 report, which became part of Wright's claims file and was produced, notes that:

> Representative photographs are in the attachments.   The photographs taken but not included in the report are available upon request.

Pl.'s Ex. 3 at 5.   Thus, in order to comply with this Court's directive that all photographs

20

be provided, defendant would necessarily have had to contact U.S. Forensic to obtain the additional but unsupplied photographs expressly identified in the report. Thus, counsel's limitation of its discovery inquiry to Wright's claims file was a clear violation of its discovery obligations.

Counsel for Wright repeatedly and vociferously argue that plaintiffs' counsel failed in *its* obligations under the CMOs by failing to provide Wright – prior to the mediation – with a copy of the fragment of the December 9 report that their clients had obtained by photographing the title and conclusion pages with a cell phone in January 2013. To an extent, defendant is correct, and plaintiffs' failure *somewhat* mitigates the harm caused by defendant. Plaintiffs' counsel is hereby admonished that future violations of this kind could result in sanctions.

At the same time, after receiving evidence that the engineers report apparently had been altered, counsel for Wright initially did little to investigate the matter. *See* Deft.'s Mem. in Opp., DE [59] at 2 (observing that the fragment "*seems* to be a draft report" and suggesting "it *might* be that this was a document that had not yet gone through the normal internal peer review process"). Next, as noted above, counsel for Wright endeavored to prematurely circumscribe the hearing, which would have left the Court and plaintiffs with a distinct misimpression of the practices employed by U.S. Forensic. Tr. 119-124. And lastly, even after the hearing, Wright attempted to defend the indefensible practices exposed here. *See, e.g.*, Deft.'s Post-Hearing Mem., DE [71] at 5 (comparing U.S. Forensics practices to *documented* NASA peer review processes); 7 ("[t]here was nothing nefarious on US Forensic's part in the revision of the report"); 8 (comparing Garove's alteration of the report to a jury trial).

Based on the above, I find that counsel for Wright violated its obligations to comply

with this Court's discovery orders,[16] thereby unreasonably prolonging this litigation, imposing unnecessary costs upon plaintiffs and further contributing to the unwarranted delays in resolving this claim.

## B. *Appropriate Remedies in this Case*

Section 636(b)(1)(A) of Title 28, United States Code empowers magistrate judges to hear and determine any pretrial matter pending before the Court (with the exception of eight specifically enumerated types of motion which are not relevant here). Because sanctions pursuant to Rule 37 fall within the scope of pretrial matters, magistrate judges are well within their authority to impose such sanctions. *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir. 1990)(holding that "[m]onetary sanctions pursuant to Rule 37 for noncompliance with discovery orders usually are committed to the discretion of the magistrate, reviewable by the district court under the clearly erroneous or contrary to law standard"). "It is well settled that district courts enjoy wide discretion in sanctioning litigants appearing before them." *Novak v. Wolpoff & Abramson, LLP*, 536 F.3d 175, 177 (2d Cir. 2008); *see also S. New England Tel. Co. v. Global NAPS Inc.,* 624 F.3d 123, 143 (2d Cir. 2010) (reviewing district court's imposition of sanctions for failure to comply with court ordered discovery for abuse of discretion). The Second Circuit has noted:

> Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs. *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 135–36 (2d Cir.1998). *See generally Chambers v. NASCO, Inc*., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) ("It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed within a Court, because they are necessary to the exercise of all others.'") (*quoting United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)).

---

[16]   Plaintiffs' counsel expended extraordinary effort making a number of personal allegations against Mr. Nielsen, one of defendant's attorneys herein, and counsel for defendant responded in kind. Having examined these matters with some care, I find them wholly irrelevant and largely, if not entirely, without basis.

*Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002).

Rule 37(b) sets forth a non-exclusive list of sanctions that the court, in its discretion, may levy on a party who "fails to obey an order or permit discovery . . . ." Fed. R. Civ. P. 37(b)(2). As relevant to the instant action, the listed sanctions include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;" "striking the pleadings in whole or in part;" as well as "treating as contempt of court the failure to obey any order." Fed. R. Civ. P. 37(b)(2)(A)(ii)-(iii), (b)(2)(A)(v), (b)(2)(A)(vii). Again, the Second Circuit's holding in *Residential Funding* proves instructive:

> Rule 37(b)(2) of the Federal Rules of Civil Procedure provides, in relevant part, that if a party fails to obey a discovery order, the court "may make such orders in regard to the failure as are just," including, but not limited to, "[a]n order that ... designated facts shall be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order."

306 F.3d at 106. The evidentiary limitations provided in Rule 37(b)(2)(A)(i)-(ii) offer a means to craft an appropriate remedy in this case.

The major effect of the reprehensible practices uncovered here – as well as counsel's failure to disclose these practices at an earlier juncture – was to unnecessarily complicate and delay this action. The context remains important: according to the City of Long Beach, the losses here totaled approximately $205,000, while the testimony at trial suggested that the insurer has already paid out about $80,000. Pl's Ex. 1. Thus, based on these rough figures, the most that could be at issue here amounted to approximately $125,000 and, based on the coverage limits of $250,000, no more than about $170,000 could be at stake. To a government-backed insurer, these are trifling figures, and in the world of federal cases, such figures are unimpressive, particularly when compared to the

exorbitant costs of litigation. On the other hand, to individual homeowners, these are staggeringly large sums. The violations in this case resulted in many months of delay for plaintiffs, and, unnecessarily, a full day evidentiary hearing and numerous briefs to fully explore these issues.

That ends now. Under Rule 37(b), in the *Raimey* case, I hereby prohibit defendant Wright from supporting its defenses or opposing plaintiffs' claims with any expert testimony other than that of Hernemar, and they may not produce, rely upon or create any expert reports other than those already produced. Defendant's application to obtain yet another expert to examine plaintiffs' claim (and its directive to plaintiff to help prepare that expert) is hereby denied. While a more significant sanction – such as striking the answer or even contempt – might be warranted on these facts, I find that this sanction constitutes a just order, which is intended to expedite this matter and avoid further unneeded complications in this case.

Having imposed that sanction, one additional matter needs to be determined. As the Second Circuit has observed:

> Rule 37(b) also provides that, in lieu of or in addition to any other appropriate order, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. Fed.R.Civ.P. 37(b)

*Residential Funding Corp.*, 306 F.3d at 106-7. Further, the Second Circuit has held "[w]hen an attorney's misconduct or failing does not involve an attempt to place the other side at an unfair disadvantage, any sanction should ordinarily be directed against the attorney rather than the party, absent strong justification." *World Wide Polymers, Inc.*, 694 F.3d at 160. Because counsel for plaintiff withheld information relating to the apparent discrepancy in reports until the mediation, no monetary sanction is appropriate for the period leading up to the mediation. However, given

discovery failures by defendant's counsel, the unreasonable response by defendant to the allegations, and counsel's shocking attempt to curtail inquiry during the hearing, it is reasonable to charge the costs associated with the hearing to defendant's counsel. Plaintiffs' counsel, therefore, may make application for reimbursement from defendant's counsel for all reasonable costs associated with the motion, the hearing and all related briefing, including attorneys' fees, travel costs and transcription costs, within thirty days of the date of this Order.[17]

### C. *Plaintiffs' Discovery Motion and the Measures Needed to Ensure Fairness in Other Hurricane Sandy Cases*

As a result of the startling findings contained herein, plaintiffs in this case, as well as all other Hurricane Sandy cases, must be provided with additional discovery to determine whether there are other expert reports, drafts, photographs and email communications that have not been disclosed to date. In their post-hearing brief, plaintiffs set forth a broad discovery plan, seeking eight depositions and twelve broad categories of documents. For the reasons set forth above, the costs of implementing such a plan may well outweigh the amounts at issue in these cases. The Committee assigned to manage these cases has endeavored "to speed resolution of these matters while also reducing costs for the parties and the burdens on the Court," CMO 1 at 2, and ultimately "to facilitate the efficient resolution of the cases." CMO 3 at 1. The Committee's approach has been consistent with the Court's mandate under Rule 1 to construe the rules "to secure the just, speedy, and inexpensive determination of every action and proceeding." Thus, to implement a plan by which the litigation costs would likely consume potential recovery would not serve the

---

[17] For the reasons set forth herein, the Court will not authorize the imposition of fees and costs relating to the *ad hominem* attacks against Mr. Nielsen. Should plaintiffs' counsel pursue an application for fees, such amounts should be identified and excluded.

interests of any party. Moreover, this massive undertaking would result in delays and complications, which will further frustrate prompt resolution of these claims.

At the same time, the issues that have surfaced require some accommodation. Therefore, as an initial response, I am directing that – within thirty days of the date of this Order – all defendants in any Hurricane Sandy case provide plaintiffs with copies of *all* reports described in CMO#1 – *plus any drafts, redlines, markups, reports, notes, measurements, photographs and written communications related thereto* – prepared, collected or taken by any engineer, adjustor or other agent or contractor affiliated with any defendant, relating to the properties and damage at issue in each and every case, *whether such documents are in the possession of defendant or any third party.* Such production should provide counsel with sufficient information to proceed to mediation and/or settlement and, where necessary, trials in these cases. Furthermore, upon receipt of such information, counsel for plaintiffs may make application for further discovery as appropriate and consistent with the principles set forth in this decision. Obviously, it would behoove defendants in all cases to be as forthcoming as possible at this juncture.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED that:

1. In the *Raimey* case, pursuant to Rule 37, defendant Wright is prohibited from supporting its defenses or opposing plaintiffs' claims with any expert testimony other than that of George Hernemar, and they may not produce, rely upon or create any expert reports other than those already produced.

2. Within thirty days of the date of this Order, plaintiffs' counsel in *Raimey* may make application to the Court for reimbursement from defendant's counsel for all reasonable costs associated with this motion, the hearing and all related briefing, including

attorneys' fees, travel costs and transcription costs, consistent with the rulings set forth herein; and

3. Within thirty days of this Order, defendants in *all Hurricane Sandy cases* shall provide plaintiffs with copies of all reports described in CMO 1 not previously produced – *plus any drafts, redlines, markups, reports, notes, measurements, photographs and written communications related thereto* – prepared, collected or taken by any engineer, adjustor or other agent or contractor affiliated with any defendant, relating to the properties and damage at issue in each and every case, *whether such documents are in the possession of defendant or any third party.*

**SO ORDERED**.

Dated:  Central Islip, New York
       November 7, 2014

                         /s/    GARY R. BROWN
                         Gary R. Brown
                         United States Magistrate Judge